Ellis, Holyoke & Company, et al. [1] v. Commissioner. Ellis, Holyoke & Co. v. Commissioner
Docket Nos. 2979-67 - 2982-67, 201-68.
United States Tax Court
T.C. Memo 1970-10; 1970 Tax Ct. Memo LEXIS 347; 29 T.C.M. (CCH) 18; T.C.M. (RIA) 70010; January 15, 1970, Filed *347 [Capital gain v. ordinary income: Capital asset defined: Compensation v. gain from capital asset: Identification of securities.] The individual petitioners, in a joing venture with Thomas R. Pansing, president of Nebraska National, purchased an option to buy 783,600 shares of Nebraska National stock to sell for a profit. Pansing negotiated an agreement with Bankers Life to sell to that company at cost sufficient shares of Nebraska National stock to control it. Pansing effected purchases of shares and options which were handled through the brokerage facilities of the corporate petitioner, owned by the individual petitioners. No commission or fee was charged. Bankers Life received 1,100,000 of 2,000,000 authorized shares of Nebraska National stock. Pansing retained 150,000 shares or options. The corporate petitioner retained 50,000 shares in its investment account. 19 The individual petitioners retained 50,000 options which they exercised. Later the petitioners sold their shares to Bankers Life for gains. Respondent contends such gains represented compensation to the corporate petitioner for services. Held: (1) The gains from sales of Nebraska National stock by the petitioners *348 were capital gains. (2) The gains from sales by the individual petitioners were not income to the corporate petitioner nor dividends to its stockholders. John W. Stewart, 1410 Sharp Bldg., 212 S. 13th St., Lincoln, Nebr., and Philip G. Johnson for the petitioners. Ronald M. Frykberg, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax in these consolidated cases as follows: Docket No.
Year
Deficiency
Ellis, Holyoke & Company
2979-67
F/Y8/31/61
$34,313.17
Ellis, Holyoke & Company
201-68
F/Y8/31/64
41,831.07
Mary L. Chapin
2980-67
1963
4,234.68
J. Huntington Ellis and Madge M. Ellis
2981-67
1961
22,784.37
George W. Holyoke and Dorothy W. Holyoke
2982-67
1961
2,284.38
1963
2,026.15
*349 The issues for decision are (1) whether the gains from sales of stock of Nebraska National Life Insurance Company by the corporate petitioner and its stockholders are taxable as capital gains or as ordinary income, and (2) whether gains from sales by the stockholders are taxable to the corporation as income and to the stockholders as dividends. Mary L. Chapin concedes adjustments relating to educational expenses in Docket No. 2980-67. The Holyokes concede a computation error for 1961 in Docket No. 2982-67. Findings of Fact The stipulation of facts and the exhibits attached to the stipulation are incorporated by this reference. The petitioners filed Federal income tax returns for the taxable years involved with the district director of internal revenue at Omaha, Nebraska. The individual petitioners were residents of Lincoln, Nebraska, at the time they filed their petitions with this Court. The principal place of business of the corporate petitioner has always been in Lincoln, Nebraska. James Huntington Ellis, herein referred to as Ellis, and his wife Madge M. Ellis, filed their joint return for the calendar year 1961 on the cash basis of accounting. Ellis sometimes appears *350 herein as James H. Ellis or as J. Huntington Ellis. George W. Holyoke, herein referred to as Holyoke, and his wife, Dorothy W. Holyoke, filed joint returns for the calendar years 1961 and 1963 on the cash basis of accounting. Mary L. Chapin, herein referred to as Chapin, filed her return for the calendar year 1963 on the cash basis of accounting. Ellis, Holyoke & Company, herein sometimes referred to as the corporate petitioner or the company, is a corporation incorporated in 1940 under the laws of Nebraska. It kept its books and filed its returns upon an accrual method of accounting and for fiscal years ended August 31. It filed corporation income tax returns for the fiscal years ended in 1960 to 1964, inclusive. The stockholders of Ellis, Holyoke & Company were Ellis, owning 61 percent, Holyoke, owning 25 percent, and Chapin, owning 14 percent of its shares. The officers were Ellis, president, Holyoke, vice-president, and Chapin, secretary-treasurer. These individuals comprised the board of directors and are sometimes referred to herein as the individual petitioners. The corporate petitioner has been engaged in business as an investment brokerage company. It has bought *351 and sold securities as agent for others for commissions as 20 a broker; has bought and sold securities for its own account as a dealer; has acted as an underwriter of securities for profit; has held securities for investment for its own account; has provided investment and financial counseling; and has assisted in arranging corporate stock acquisitions for fees or compensation. During all times material Ellis, Holyoke & Company was a member of the Midwest Stock Exchange and a member of the National Association of Securities Dealers. Since September 26, 1940, Ellis, Holyoke, and Chapin have individually been licensed by the State of Nebraska as securities salesmen to represent Ellis, Holyoke & Company. During all times material Ellis, Holyoke and Chapin were active in the business of the company. The company during 1960 and subsequently has had about 15 employees. It maintained the facilities and equipment necessary for its operations. It has established a line of credit with banks in the Lincoln area permitting it to pursue its business activities. The amounts of income derived by the company from commissions, fees, and underwriting profits have always exceeded the amounts *352 received upon sales of securities held for investment. The corporate petitioner maintained an account entitled "Investment Securities Owned" in which it entered various securities held for investment purposes as distinguished from securities held for trading purposes. The stockholders made investments in securities from time to time which were recorded in the company's customer's accounts in their individual names. Nebraska National Life Insurance Company (sometimes hereinafter referred to as Nebraska National) is a stock legal reserve life insurance company incorporated in 1946 under the laws of the State of Nebraska, with its principal office in Lincoln, Nebraska. Nebraska National shares were not listed on a stock exchange but were traded in over-the-counter markets. The corporate petitioner maintained a trading account in Nebraska National common shares. On July 8, 1958, Ellis, Holyoke & Company purchased 11,000 shares of Nebraska National stock for $11,000. These shares were initially entered in the company's trading account. On July 30, 1958, 10,000 of the 11,000 shares were transferred from the trading account and entered in the account captioned "Investment Securities *353 Owned." The rest of the shares were sold to customers during July, 1958. In September 1958, the authorized capital stock of Nebraska National was increased to $1,000,000 divided into 2,000,000 shares with a par value of 50 cents per share. In September 1958 Nebraska National granted a 5-year option to Allied Colorado Enterprises Company to acquire 1,100,000 shares of Nebraska National capital stock for $2 per share. In 1959 this option was transferred to Allen J. Lefferdink Enterprises, Inc. Some of the options were exercised or transferred to other persons. As of March 10, 1960, the option remaining was for 783,600 shares. As of December 31, 1959, Nebraska National had assets of approximately $3,000,000, liabilities of $2,520,000 and capital and surplus of $476,000. As of February 8, 1960, Nebraska National had 612,872 shares of stock outstanding, which were held by more than 4,000 stockholders. This insurance company's financial condition was impaired and it needed additional capital. Nebraska National had, in 1957, borrowed $551,250 on a promissory note described as a "surplus note," which was not repayable until the company's surplus was double the amount of the note. *354 The holder had the right to elect payment in cash or in 350,000 shares of capital stock of Nebraska National. In March 1960 this note was held by Oil Industry Factors, Inc., a corporation, of Houston, Texas. Thomas R. Pansing was president of Nebraska National from 1958 and through the taxable years. Pansing was formerly Insurance Director for the State of Nebraska. In early 1960 he was owner of 7,977 shares of Nebraska National capital stock and of options to acquire 61,000 shares. He was acquainted with a number of the owners of large amounts of stock or options and was aware of the need for improving the financial condition of the corporation. He was acquainted with Holyoke. Pansing learned in early 1960 that the financial affairs of Lefferdink were in a bad state. He was concerned that the large option might fall into the hands of a receiver or trustee. He knew also that some of the assets of Nebraska National were no longer admissible under the state law. 21 In February or March 1960, Pansing learned that the option held by the Lefferdink company could be acquired for $100,000. He approached Holyoke and Ellis proposing that they join him as partners in purchasing the *355 option. After discussion, a general agreement was reached that the option be purchased, Pansing having a one-half interest, and Holyoke, Ellis and Chapin having a one-half interest. Pansing expressed the opinion that he could sell the option for a gain. The purchase was negotiated by Pansing and handled through the corporate petitioner's facilities. The company borrowed $100,000 from the National Bank of Commerce, of Lincoln, on March 9, 1960. The purchase was made on March 10. The company transferred 391,800 options to Pansing's account and billed him for $50,000, which he paid. The individual petitioners did not treat the options as held for sale to customers as they were not registered as securities with the Securities and Exchange Commission and were being held for Pansing to sell. The company repaid the bank loan in March 1960. After this purchase the company insured Pansing's life for $50,000 for its own protection. The company opened an account for Nebraska National options with an entry of 391,800 at cost of $50,000. Pansing looked up several persons in an effort to find a prospective purchaser for the options. He paid $100 for a 30 or 60 day option to purchase the surplus *356 note held by Oil Industries Factors, Inc. He was in touch with the other stockholders of Nebraska National who were interested in selling their shares. Bankers Life Insurance Company of Nebraska, herein referred to as Bankers Life, is a mutual insurance company organized under the laws of Nebraska with its home office in Lincoln. Bankers Life was a much larger company than Nebraska National. As of March 31, 1960, it had a surplus of over $12,000,000. In 1960 and later the president of Bankers Life was George B. Cook. Cook was acquainted with Pansing and with Ellis. On May 7 and 8, 1960, Pansing had conversations with Cook in which Pansing suggested that Bankers Life acquire sufficient stock or options to secure control of Nebraska National. Cook expressed an interest in the suggestion. Cook had been looking for an opportunity for Bankers Life to acquire control of another life insurance company if available at a reasonable price. He told Pansing that if Bankers Life was unwilling to make the investment, he would form a syndicate with friends to do so. In the following several weeks Pansing met with Cook, and James H. Ackerman, general counsel of Bankers Life, to discuss the proposal *357 in detail. Ellis attended one meeting of these parties on May 22. A meeting of the Board of Trustees of Bankers Life was held May 23, 1960. The minutes of this meeting, in part, reflect the following: President Cook reported that he had been in contact with Thomas R. Pansing, President of Nebraska National Life Insurance Company of Lincoln, and James H. Ellis of Ellis, Holyoke & Co. of Lincoln, with reference to the acquisition by Bankers Life of a controlling interest in Nebraska National Life as an investment for Bankers. He gave a full report of the negotiations and available information concerning the company, its ownership and control, its financial standing, its management and methods of doing business and prospects for success if more adequately financed, as well as the proposals made for acquiring not less than 55% of its authorized stock, with assurances of cooperation by Messrs. Pansing and Ellis who control at least an additional 12 1/2% of the authorized stock, in the event of sale of the company, its business or assets, reinsurance merger or mutualization. He reviewed the proposed price of the available interest, the quoted market price of the stock, the future relationship *358 of the two companies if the purchase were to be consummated, and all other aspects of the transaction. After a full discussion by the Board the following resolution was duly made, seconded and unanimously carried: Be it resolved that the President be and he hereby is authorized to negotiate for and purchase a controlling interest in Nebraska National Life Insurance Company for such price, not exceeding two million dollars, and upon such terms as he may deem advisable, subject to favorable opinions as to the legality of the investment and final approval by the Board. After securing the agreement with Cook, Pansing negotiated purchases of shares and options which were delivered to and paid for by the corporate petitioner. On May 23, 1960, Ellis, Holyoke & Company paid $3,500 to J. O. Robinson and acquired options to purchase 25,000 shares of Nebraska National stock. On or about May 24, 1960, the company borrowed $100,000 from First Continental 22 National Bank and Trust Company, Lincoln, Nebraska. On or about May 26, 1960, the company borrowed $350,000 from Continental Illinois National Bank and Trust Company, Chicago, Illinois. Cook, on behalf of Bankers Life, guaranteed *359 payment. On May 26, 1960, the company paid $24,200 to Martin Investment Company and acquired options to purchase 50,000 shares of Nebraska National stock. On May 31, 1960, the company paid Oil Industries Factors, Inc., $250,000 and acquired the surplus note of Nebraska National in the face amount of $551,250, which note was convertible into 350,000 shares of Nebraska National stock. Ellis, Holyoke & Company had a credit balance of 6,460 shares of Nebraska National stock in its trading account as of May 16, 1960. During the period May 16, 1960, through June 2, 1960, the company bought 91,371 shares of Nebraska National stock from various customers and sold 1,525 shares. As of June 2, 1960, the company owned a balance of 83,386 shares of Nebraska National at a cost to it of $168,953.25. On or about June 9, 1960, the company borrowed $150,000 from Continental Illinois National Bank and Trust Company of Chicago. This loan was also guaranteed by Cook on behalf of Bankers Life. On June 9, 1960, the company exercised options to purchase 100,000 shares of Nebraska National stock, paid Nebraska National $200,000, and acquired 100,000 shares. On the same date the company transferred *360 40,000 shares of Nebraska National stock at $2 per share to its Investment Securities Owned account. On the same date the company transferred 10,000 shares to William Gold, II, a member of the board of directors of Nebraska National, and 10,000 shares to Kenneth E. Anderson, both sales at a price of 2 3/8. A special meeting of the Board of Directors of Nebraska National was held on June 13, 1960. The minutes of this meeting reflect, in part, the following: The President reported in detail concerning the acquiring of certain options for stock in the company by Ellis-Holyoke & Company and himself, and a proposed sale of stock in Nebraska National to Bankers Life Insurance Company of Nebraska by Ellis-Holyoke & Company which would give Bankers Life Insurance Company of Nebraska approximately 55 per cent of the authorized stock in Nebraska National. The Board indicated its general approval of the proposal and requested the President to continue the negotiations. A special meeting of the Board of Trustees of Bankers Life was held on June 16, 1960. The minutes of this meeting reflect, in part, the following: President Cook announced that the purpose of this meeting was to bring *361 before the Board of Trustees additional information concerning negotiations for purchasing a controlling interest in the Nebraska National Life Insurance Company as an investment for Bankers Life. Mr. Cook explained that since the Board meeting of May 23, 1960, at which time a full explanation of the proposed acquisition of a controlling interest in Nebraska National was outlined, there had been some change in the proposal. He advised that whereas Bankers had formerly been considering the acquisition of stock options which would give Bankers an opportunity to acquire control of Nebraska National, the present proposal provides for the acquisition of issued and outstanding stock equal to 55% of the authorized capital stock of Nebraska National. He further stated that Thomas R. Pansing and Ellis, Holyoke & Co. were retaining stock and stock options totaling 12 1/2% of the authorized stock of the company. These individuals refused to sell this stock at this time. The best terms that could be obtained with reference to this stock consists of certain restrictions giving Bankers rights which assure Bankers of effective control in event of merger and other situations as contained in a letter *362 which was subsequently read to the Trustees by Mr. Ackerman, and which is contained in the Investment file. He pointed out that this would greatly simplify the transaction, although it would involve payment of a larger amount of cash at the outset than would have been necessary under the previous proposal. Mr. Cook also pointed out that it was now possible to give exact figures on the transaction and advised that Bankers Life would acquire 1,100,000 shares of stock for the price of $1,867,639.71. He pointed out that this price represents a cost of $1.6978542 per share. * * * There followed a general discussion, after which the following resolution was proposed, seconded and unanimously adopted: BE IT RESOLVED that the President be and he hereby is authorized and directed to consummate the purchase for investment of 1,100,000 shares of common 23 stock of Nebraska National Life Insurance Company constituting fifty-five percent of that company's authorized capital stock at a price of $1,867,639.71, and the officers of the company are hereby authorized and directed to perform any and all acts necessary and convenient to carry out the intent and purpose of this resolution. A transcript *363 was taken of what was said at the special meeting of the Board of Trustees of Bankers Life held June 16, 1960. Such transcript reflects, in part, the following: Cook: That is to bring you up-to-date with the exception that at the last meeting we were talking about buying options and the surplus note. If we go ahead with this purchase we will be buying common stock only. We will be buying exactly 1,100,000 shares at a cost of $1,867,639.71 or a cost per share to us of $1.6978542 or approximately $1.70 a share. Enough options will be exercised by Ellis, Holyoke so that the surplus note can be retired. We will be paying the exact cost that Ellis and Pansing have in this stock. We will be purchasing the stock from Ellis-Holyoke & Company who now have control of options and the surplus note where they would get the 1,100,000 shares. The company after tomorrow - that's the Nebraska National - would have approximately $1,125,000 of surplus and approximately $865,000 of capital stock outstanding. * * * Cook: * * * Jim Ellis has been a good friend of mine for a long time and Tom Pansing has been a good friend of Jim Ackerman's for a long time. I think it's always more fun to deal with friends *364 than with enemies and I can't see any reason why that is a reason we shouldn't buy this stock, but I can say very frankly this was arms length trading all the way. We certainly didn't agree on all things all the way and it was a matter of negotiation and arguing all the way and giving and taking. I can't see in any of this negotiation where friendship worked against the best interests of Bankers Life. Next thing that we might be criticized for some day is that we bought this and furnished a good deal of capital for this company but Pansing ends up with 150,000 shares and Ellis with 100,000 shares. If this company does as well as we think it will they will make a considerable amount of money for their own personal use. We tried to buy their 250,000 shares and couldn't. So, as far as I am concerned a part of what we had to do to make a deal was to let each of them have that respective amount of stock, and we didn't let them have it because they had it all in effect and it was a question of them selling us what they would and not our letting them have anything. So, that is a point that might be criticized, but there isn't anything that we can do about it and if it is a good deal for Bankers *365 Life to buy 1,100,000 shares they should probably have the right to make some money also and they are going to exercise all options that they hold by December of 1960. Our purchase price, as I said, would be approximately $1.70 a share and in both the case of Pansing and Ellis after they exercise their options their purchase price will be above $2.00 a share. Stebbins: They are going to exercise their options? Cook: They are going to by the end of the year. Their price on exercise of options will be at $2.00 a share. Our agreement that was tentatively made subject to the approval of this Board is that we will not buy any more stock in this company except the stock that may be offered to us by Pansing because either he or Ellis want to sell some of their stock. The reason is that I don't want to see Bankers Life ever accused of manipulating a market. * * * Cook: We have been negotiating with Ellis and Pansing about our right to purchase their stock for various reasons and it is my understanding now that they have agreed to sign the letter that Jim is going to read. * * * Stebbins: Would Ellis sign that too? * * * Millard: Why doesn't Ellis give the letter to Bankers Life instead *366 of to Pansing? Cook: This was an agreement between Ellis and Pansing which we frankly had no part in. As long as we are assured of ultimate control it was agreeable to us that Ellis' shares should first be offered to Pansing. Pansing might sell them to us later at a higher price than he paid Ellis. This was part of the negotiations and we couldn't do anything about this and Ellis-Holyoke being dealers will be trading in this stock and we know that undoubtedly eventually this stock - the Ellis stock will end up in the hands of Ellis-Holyoke, Jim Ellis as a person, George Holyoke as a person and Mary Chapin as a person * * *. Prior to or on June 17, 1960, Ellis, Holyoke & Company agreed to and subsequently did transfer 22,423 shares of Nebraska National stock to Pansing. On June 17, 1960, the company transferred to Charles D. Casper 963 shares of Nebraska National stock at a price of 2 3/8. Casper was secretary-treasurer of Nebraska National and a member of its Board of Directors. On June 17, 1960, the company acquired from Pansing options to 24 purchase 333,200 shares of Nebraska National stock. On June 17, 1960, the company borrowed $1,300,000 from the First Continental National *367 Bank and Trust Company of Lincoln. A special meeting of the Board of Directors of Nebraska National was held June 17, 1960, at which Ellis was present. At the meeting Ellis, on behalf of Ellis, Holyoke & Company, exercised options to purchase 650,000 shares of Nebraska National stock, delivered a check drawn on the company's account in the amount of $1,300,000 to Nebraska National, and received 650,000 shares of stock. As a result of the exercise of the options for 650,000 shares, Nebraska National had unassigned surplus in excess of double the principal amount of its outstanding surplus note and thus was legally able to redeem the surplus note in cash or capital stock as the holder should elect. Ellis then delivered a letter whereby Ellis, Holyoke & Company elected under the terms of the surplus note previously acquired to receive in payment 350,000 shares of Nebraska National stock. Upon surrender of the surplus note the company received the stock. Subsequently on June 17, 1960, a Memorandum of Agreement was executed by Ellis, Holyoke & Company and Bankers Life for the sale of 1,100,000 shares of Nebraska National stock for the sum of $1,867,639.71. The stock was transferred *368 on that date and the sum was paid. Simultaneously with the sale of 1,100,000 shares of Nebraska National stock the company delivered a letter agreement, dated June 17, 1960, to Bankers Life which stated as follows: You are acquiring by purchase from Ellis, Holyoke & Co., 1,100,000 shares of Nebraska National Life Insurance Company, a Nebraska insurance corporation, referred to as 'Nebraska', representing 55% of that corporation's authorized capital stock. Ellis, Holyoke & Co. or stockholders of that company are retaining shares of stock or options for shares of stock to a number of 100,000 shares. Thomas R. Pansing is retaining shares of stock or options for shares of stock to a number of 150,000 shares. Together these retained shares will represent 12 1/2% of the corporation's authorized stock. It is our intention and that of Thomas R. Pansing and we and each of us agree that under certain circumstances enumerated below and while you shall own said shares you shall have an enforceable right to require that the shares covered by this agreement shall be offered and tendered to you at market price, or in the alternative at our election voted with your shares, thus giving you a *369 means of accumulating a two-thirds majority necessary to accomplish the enumerated corporate acts. For good and valuable consideration, receipt of which we acknowledge, we agree for ourselves and our assigns as follows: 1. That we will on or before December 1, 1960, exercise all options held by us and pay to Nebraska the option price. 2. That all stock now owned by us and all acquired hereafter to the extent of 100,000 shares but no more, shall during the said term of this agreement be subject to the rights, powers, restrictions and limitations of this agreement, and the certificates evidencing such shares shall be immediately accordingly endorsed, and said rights, powers, restrictions and limitations shall follow the stock into the hands of and bind all transferees and pledgees of said shares until the purpose of this agreement is fully discharged. 3. In the event that Bankers shall deliver to us written notice that by action of its Board of Trustees it has determined to sell or contract to sell all of its stock in Nebraska, then we agree that we will promptly offer and tender to Bankers, or at Bankers' option to its prospective purchaser, all of the shares covered by this *370 agreement. 4. In the event that Bankers shall deliver to us written notice that by action of its Board of Trustees it has determined to vote its stock in Nebraska and take other appropriate action (a) to acquire for Bankers or another purchaser all or substantially all of the assets of Nebraska, or (b) to reinsure or enter into an agreement to cede to and reinsure in Bankers or another insurer all or substantially all of the insurance business of Nebraska, and in either case to cause Nebraska to retire from the insurance business and liquidate the company, or (c) to merge Nebraska into or consolidate Nebraska with Bankers or another insurer with Bankers or such other insurer being the surviving and continuing company, of (d) to amend Nebraska's charter to change its corporate form to that of a mutual company, then in such case we agree that we will vote all of the shares covered by this agreement favorably to such action and fully cooperate in carrying out such program of acquisition, reinsurance, liquidation, or merger or consolidation, as the case may be, or in the alternative, as we may elect within five days from receipt of such notice, that we will promptly offer and 25 *371 tender the shares covered by this agreement to Bankers. The restrictions contained herein and a right of first refusal to Thomas R. Pansing granted to him today of the shares covered by this agreement shall not prevent transfer of any shares covered by this agreement to James H. Ellis, George W. Holyoke or Mary Chapin, the stockholders of Ellis, Holyoke & Co. nor shall it prevent our pledging as collateral security any of such shares, but any such transferee or pledgee will hold such stock subject to all of the terms of this agreement. As used above in paragraphs 3 and 4, the term 'offer and tender' shall mean the offer for sale and tender for delivery of the shares which are the subject of this agreement: (a) a price per share equal to the bid side price on the established open market at the close of the day on which notice of action of Bankers' Board of Trustees is delivered to us, or if no bid was made on that day then the latest bid price recorded, or (b) in the case of a proposed sale by Bankers of all of its stock as described in paragraph 3, at the price to be paid by its purchaser, if that be higher. Any such offer and' tender shall be held open and good for a period of *372 five regular business days (Saturdays, Sundays and legal holidays excluded) from the time the offer and tender is communicated to Bankers or the purchaser of its stock, as the case may be. As used above, the term 'the shares covered by this agreement' shall mean and include all shares held by us, or such permitted transferees as may hold it pursuant to the provisions of paragraph 4, whenever acquired to the extent of 100,000 shares and all additions thereto from stock splits and dividends. It is understood that the rights, powers, restrictions and limitations stated herein shall terminate and cease at such time as Bankers shall cease to hold at least fifty percent of Nebraska's outstanding voting stock, and that they shall not follow shares sold by Bankers into the hands of its transferees. The letter agreement was subsequently modified to include the words "or to the spouses, children or grandchildren of said stockholders or to the spouses of such children or grandchildren" within the second subpart of paragraph numbered "4." Simultaneously with the sale of 1,100,000 shares of Nebraska National stock Ellis, Holyoke & Company delivered a letter agreement executed on its behalf, *373 dated June 17, 1960, to Pansing which stated as follows: We own shares in Nebraska National Life Insurance Company and options to purchase such shares representing a total of 100,000 shares and have today signed a letter to Bankers Life Insurance Company of Nebraska stating certain restrictions relative to said shares. You own shares in Nebraska National Life Insurance Company and options to purchase such shares to a total of 150,000 shares and have today signed a similar letter relative to said shares. For valuable consideration, receipt whereof is hereby acknowledged, we agree and undertake that in the event we offer to sell any of the shares referred to in our said agreement to notify you in writing of such offer, the identity of the prospective purchaser and the price per share agreed to, and we agree to offer and tender delivery to you all or any part of the said shares at such agreed price. Said offer and tender shall be held open and good for five business days from receipt by you of such notice. This restriction shall not prevent our transfer of any of the covered shares to James H. Ellis, Mary Chapin or George W. Holyoke or by them to their spouses, their children's *374 spouses, grandchildren or grandchildren's spouses, but such stock shall be fully subject to this restriction in the transferees hands. Simultaneously with the sale of 1,100,000 shares of Nebraska National stock Bankers Life delivered to Ellis, Holyoke & Company a letter agreement dated June 17, 1960, which stated as follows: We are today acquiring 1,100,000 shares of Nebraska National Life Insurance Company common stock. You have delivered to us a letter dated today setting out certain restrictions on 100,000 shares of Nebraska to be retained by you. In consideration of your imposing such restrictions we agree that if at any time while you continue to own any of the shares of Nebraska covered by your said letter we sell or agree to sell stock the sale of which will reduce our holdings to less than fifty percent of Nebraska's outstanding stock we will offer to purchase any or all of your shares at the same price as we receive, and if the offer is not accepted within five business days then our obligation to purchase shall terminate. On June 17, 1960, Pansing delivered to Bankers Life a letter similar to that of Ellis, Holyoke & Co., agreeing to tender his shares to Bankers Life *375 at market or vote them with Bankers Life's shares. At the same time Bankers Life delivered a letter agreement to Pansing similar to that it delivered to the corporate petitioner. On June 17, 1960, the company repaid the loan of $1,300,000 of the same date to First 26 Continental National Bank and Trust Company, and repaid the loans of May 26 and June 9 of $350,000 and $150,000 from Continental Illinois, of Chicago. The company, on June 21, 1960, repaid the $100,000 borrowed on May 24 from First Continental, of Lincoln. Interest was paid on these loans. Ellis, Holyoke & Company did not charge and was not paid a direct fee or commission by Nebraska National or Pansing or Bankers Life for its participation in the transactions leading to Bankers Life's acquisition of 1,100,000 shares of Nebraska National stock. The $1,867,639.71 amount paid to the company by Bankers Life to purchase the 1,100,000 shares did not exceed the total of what was actually paid by the company to acquire options, shares, and the surplus note, and charges for interest, stamp or transfer taxes, and a miscellaneous cost charge of $150. Also on June 17, 1960, the company transferred options to purchase *376 shares of Nebraska National stock to Ellis, for 30,500 shares, Holyoke for 12,500 shares, and Chapin, for 7,000 shares at a value of 13 cents per share. The stockholders paid the company for these options. On the day of the June 17, 1960, sale of 1,100,000 shares to Bankers Life, a news release regarding the transaction was furnished to various news reporting services. News regarding the sale was thereafter published by such services. The news release stated as follows: Purchase of 55% of the capital stock of Nebraska National Life Insurance Company by Bankers Life Insurance Company of Nebraska was consummated today in Lincoln, where both companies have their home offices. The transaction involved the transfer to Bankers Life by Ellis-Holyoke and Company, local investment dealer, of 1,100,000 newly-issued shares of Nebraska National Stock. The two Company Presidents, George B. Cook of Bankers Life and Thomas R. Pansing of Nebraska National, in a joint statement expressed their conviction that the new relationship will work to the benefit of their policyholders. Mr. Pansing pointed out that as the result of the new stock purchase his Company's already sound financial condition *377 has been greatly augmented. He continued that this will make possible a substantial program of expansion and growth. 'Our stockholders will be gratified to know that Nebraska National capital and surplus now amount to almost $2 million dollars, he stated. 'We are also pleased to report development of new programs in Iowa, Washington and Oregon which should produce substantially increased premium income and profit during the next few years.' Both presidents confirmed that each company will continue to operate independently of the other, there being no intention to merger or consolidate. 'Since Nebraska National will continue on its own independent way, I contemplate no changes in our administrative personnel or Board of Directors,' Mr. Pansing stated. Mr. Cook emphasized the fact that the Board of Trustees of Bankers Life is convinced that the Nebraska National Stock is an exceptional investment with unusual opportunity for future earnings and growth. He said, 'Although Nebraska National has been and still is a relatively small life company, Mr. Pansing is an outstanding insurance executive and now he will no longer be restricted by a limited surplus. We are certain that we have *378 made a sound investment for the benefit of our policyholders.' Nebraska National stock was traded in the range of 1 3/4 to 2 i/4 per share in January to April 1960. Quotations in the later months show prices in May 1 3/4 to 2 i/4; June 1, $2.00; June 20, 3 i/2 and 4; June 22, 3 3/4 to 4 i/8; July to December 3 3/8 to 4 i/4. In 1961 the stock was traded at 3 7/8 to 4 3/4 in the first six months and upward to 6 i/8 in the later months. In 1962 the price was as high as 6 i/4 in February but declined to 3 i/2. In 1963 the trading range was 3 5/8 to 4 i/8. The corporate petitioner's trading account in Nebraska National shares following June 17, 1960, shows purchases and sales in small lots from one to one thousand shares with a few transactions in larger quantities. On December 6, 1960, upon payment of $2.00 per share to Nebraska National, options to purchase 30,500 shares of Nebraska National stock were exercised by Ellis, options to purchase 12,500 shares were exercised by Holyoke, and options to purchase 7,000 shares were exercised by Chapin. Each of the stock certificates issued to Ellis, Holyoke and Chapin had the following endorsement typed thereon: The shares represented *379 by this certificate are subject to the terms of two letters both dated 6/17/60, from Ellis, Holyoke and Co. by J. H. Ellis, President, to Bankers Life Ins. Co. of Nebr. 27 and to Thomas R. Pansing, respectively, copies of which are attached hereto. Two stock certificates for 5,000 shares each, issued May 23, 1960, and a certificate for 40,000 shares issued June 24, 1960, to Ellis, Holyoke & Company were endorsed in identical fashion. In June 1961 Ellis offered his 30,500 shares of Nebraska National stock to Pansing, who declined to purchase them. Ellis sold these shares on June 9, 1961, to Bankers Life for $4 per share, or $122,000. Holyoke offered 6,500 of his 12,500 shares to Pansing, who declined to purchase them. On June 9, 1961, Holyoke sold these shares to Bankers Life for $4 per share, or $26,000. The market price in June was 4 1/4 to 4 3/4 for smaller quantities. In March 1962 the corporate petitioner made an offer to Pansing to sell him 40,000 shares of Nebraska National stock at $6 per share. Pansing declined to buy. In order to offer the unregistered Nebraska National stock for sale to the public it was necessary to secure clearance from the Securities and Exchange *380 Commission, herein referred to as the SEC. In a letter dated October 31, 1962, Ellis, Holyoke & Company requested the SEC to issue a "no action" letter with regard to the sale of 63,000 shares of Nebraska National stock yet retained by Holyoke, Chapin and the company. In that letter it was stated that the shares, with the exception of 10,000, were acquired in the course of a series of transactions in which this firm was instrumental in effecting the purchase of a controlling stock interest in the Issuer by Bankers Life Insurance Company of Nebraska. In a letter reply dated November 26, 1962, the SEC refused the request, stating: We are not prepared to conclude that the firm, Mr. Holyoke and Miss Chapin are not part of the controlling group of Nebraska National Life Insurance Company particularly in view of the right of first refusal, the voting rights in certain instances, and the part the firm took in the acquisition of the share and options of Nebraska; thus, any public offering or sale of the shares would be subject to the registration requirements of the Securities Act of 1933. In the fall of 1963 the company offered its 50,000 shares of Nebraska National stock to Pansing, *381 who refused to purchase them. Holyoke offered his remaining 6,000 shares and Chapin offered her 7,000 shares to Pansing, who refused to buy. On October 4, 1963, Bankers Life purchased Holyoke's 6,000 shares, Chapin's 7,000 shares and the company's 50,000 shares at the price of $4 per share, or a total of $252,000. The trading price at that time was 3 3/4 to 4 1/4 per share for smaller quantities. At that time Cook was reluctant to buy these shares. The minutes of Ellis, Holyoke & Company reporting meetings of its directors and stockholders held during the years ended August 31, 1960, through August 31, 1964, contained no reference to any of the transactions concerning the acquisition of shares of Nebraska National stock during 1960, the sale of 1,100,000 shares of such stock to Bankers Life, the retention of shares of Nebraska National stock, the subsequent transfers of such shares, or any of the matters related thereto. Following the June 17, 1960, acquisition of the 1,100,000 shares, the only additional shares of Nebraska National stock acquired by Bankers Life were the 37,000 shares acquired in 1961 and the 63,000 shares acquired in 1963. Ellis, Holyoke & Company did not declare *382 any dividends during the taxable years ended in 1960 to 1964. The company's earned surplus and undivided profits, as shown on Schedule M - Reconciliation of Taxable Income and Analysis of Earned Surplus and Undivided Profits of its Federal income tax returns, at August 31 of each of the indicated years was in the following respective amounts: Earned Surplus and
Fiscal Year
Undivided Profits
Ended 8/31
at August 31
1960
$ 124,922.78
1961
140,237.79
1962
155,305.16
1963
162,159.34
1964
268,428.22
The income tax returns of Ellis, Holyoke & Company reported the following amounts of gross receipts and of net gains or losses from transactions shown on Schedule D: Fiscal Year
Net Gains or
Ended 8/31
Gross Receipts
(Losses)
1960
$351,931.48
$ 6,423.21
1961
272,147.75
16,607.14
1962
263,940.94
(957.03)
1963
220,004.08
183.96
1964
274,541.49
104,344.46 28 Balance sheets of Ellis, Holyoke & Company as of August 31 in 1959 and 1960 show: Assets
1959
1960
Cash
$114,718
$170,714
Notes and Accts. Rec
99,611
87,539
Inventory - Securities
49,952
47,403
Prepaid Insurance
170
2,592
Other Investments
32,042
117,903
Fixed Assets - less deprec
16,882
22,180
Securities loaned and Stock Exch. Membership 24,500
25,662
$337,875
$473,994
Liabilities and Capital
Accts. Payable
$217,689
$239,725
Accrued Liabilities
14,209
23,824
Federal Income Tax
5,500
48,000
Capital Stock
28,900
28,900
Paid in surplus
8,622
8,622
Earned surplus and undi- vided profits 62,955
124,923
$337,875
$473,994
*383 In its income tax return for the fiscal year ended in 1964, Ellis, Holyoke & Company reported long-term capital gain of $110,000 on sale of Nebraska National stock in September 1963. The Ellises reported long-term capital gain of $56,986.20 in their return for 1961 upon sale of Nebraska National stock in June 1961. The Holyokes reported long-term capital gain of $11,131.00 in 1961 and of $11,210.40 in 1963 on sale of Nebraska stock in the respective years. They concede that the correct amount for 1961 was $12,131.00. Mary L. Chapin reported long-term capital gain of $13,090.00 in her return for 1963 upon sale of Nebraska National stock. In the cases of the individual petitioners, respondent determined that the taxpayer earned a dividend from Ellis, Holyoke & Company, in lieu of the long-term capital gain reported from sale of stock of Nebraska National. In the case of the corporate petitioner, respondent determined (1) that income earned by the controlling stockholders upon sale of Nebraska National stock was earned by the corporation as ordinary income from its trade or business and (2) that gain realized on the sale of Nebraska National stock in 1963 was ordinary income *384 rather than capital gain as reported. Opinion The principal issue is whether the gains realized by the petitioners upon sales of stock in Nebraska National are taxable as capital gains or as ordinary income. In February or March 1960 Pansing, the president of Nebraska National, persuaded the individual petitioners, Holyoke, Ellis and Chapin, to invest $50,000 for a one-half interest in an option to purchase a large number of shares of the stock. Pansing represented that he could sell the option for a profit. At that time the petitioners had no intention of purchasing more stock or options. The purchase was for convenience handled through the brokerage facilities of the corporate petitioner, owned by the individual petitioners. The options were not held for sale to customers as they were held for Pansing to sell and also because they were not registered with the Securities and Exchange Commission. Pansing's efforts to find a buyer were fruitless until he met with Cook, president of Bankers Life, a much large insurance company, in early May 1960. Pansing, who was acquainted with the larger stockholders and option holders of Nebraska National and knew of the holder of the surplus *385 note exchangeable for shares of stock, showed Cook that it was possible to assemble sufficient stock or options to acquire control of Nebraska National. Cook agreed that if Bankers Life would not make the investment, he, personally would form a syndicate with friends to acquire the stock if the price was right. Bankers Life authorized Cook to proceed with the acquisition of a controlling interest at a cost not to exceed $2,000,000. Pansing then set about purchasing shares an options to carry out the arrangement with Cook. The corporate petitioner had in its investment account 10,000 shares of Nebraska National stock purchased in 1958 and 6,460 shares in its trading account. Pansing negotiated purchases which were handled through the trading accounts of the corporate petitioner. Ellis attended one of several meetings between Pansing and representatives of Bankers Life. The corporate petitioner borrowed funds to make purchases including the surplus note. Cook and Bankers Life guaranteed $500,000 of these borrowings to effect the acquisitions. Shares and options were acquired aggregating over 1,370,000, out of 2,000,000 authorized shares. The closing of the deal was carried out on *386 June 17. Bankers Life bought 1,100,000 shares of Nebraska National stock. Pansing retained 150,000 shares or options. The corporate petitioner retained 50,000 shares 29 in its investment account. The individual petitioners retained 50,000 options in the proportion of their stockholdings in the corporate petitioner. The price of the shares to Bankers Life was approximately $1.70 per share, which was the cost to Pansing and the petitioners. The corporate petitioner had acquired 10,000 shares in 1958 at $1 per share and 40,000 on June 9, 1960, at $2 per share. The 50,000 share options were transferred to the individual petitioners at a price of 13 cents per share which was the cost, and was the amount they paid to their company. The individual petitioners exercised the options in December 1960, paying $2 per share for the stock in addition to the price of the options. Ellis sold his shares in June 1961. Holyoke sold part of his shares in 1961 and the remainder in 1963. Chapin sold her shares in 1963. The corporate petitioner sold its shares in 1963. All these sales were at a price of $4 per share, which was within the market range at the time of sale. All these sales were made to *387 Bankers Life. The trading price was in excess of $6 at one time prior to the sales in 1963. As a part of the arrangement with Bankers Life, the corporate petitioner agreed that its shares of Nebraska National stock would, upon request, be voted with Bankers Life's shares or tendered to Bankers Life at market price, and that the shares transferred to its stockholders would be subject to this agreement. Bankers Life on its part agreed that if it sold such shares as to reduce its holdings to less than 50 percent of the stock outstanding it would purchase the petitioners shares at the same price it was to receive. The petitioners' shares were to be offered first to Pansing, and secondly to Bankers Life, before being sold to any other purchaser. Respondent's contention is as follows: Ellis, Holyoke & Company was instrumental in effecting the sale of a controlling interest in Nebraska National stock to Bankers Life. It was not paid a fee or commission for its services in connection with such sale, but instead retained 100,000 shares or options for shares of Nebraska National stock, which shares were subject to certain restrictions agreed upon as a part of the sale. Upon the public announcement *388 of the acquisition of a controlling interest by Bankers Life, the market value of Nebraska National shares rose sharply, as was expected, from around $2 per share to around $4 per share. Subsequently, the retained 100,000 shares were sold to Bankers Life for $4 per share. The gains realized upon sales of 50,0000 of the shares were reported as long-term capital gains on the individual returns of the stockholders. The gain upon the sale of the other 50,000 shares was reported by the company as long-term capital gain. The respondent determined that the gains were taxable as ordinary income, that the gains from the sales reported by the stockholders were includable in the taxable income of the company and that the net gains received and reported by the stockholders were taxable to them as dividend income. The position of the respondent is that the company's intended compensation for the valuable services it rendered in connection with the sale of the controlling stock interest to Bankers Life was to be realized upon the subsequent sales of the retained 100,000 shares at their enhanced value. The enhancement in the value of the shares was entirely traceable to the series of transactions *389 the company had assisted in arranging and completing whereby Bankers Life acquired a controlling interest in Nebraska National. Accordingly, the gains so realized were compensatory and taxable as ordinary income. It is respondent's further position that the arrangements for having 50,000 shares sold in form by the stockholders of Ellis, Holyoke & Company were made as an effort to have corporate income generated by the company diverted to its stockholders for tax purposes, and that the gains realized upon the sale of such shares should be includable in the taxable income of the company. Likewise, it is respondent's further position that the diverted corporate income received and retained by the stockholders upon the sales of the 50,000 shares should be taxable to them as constructive dividends. Respondent refers to testimony by Pansing that he expected Ellis, Holyoke & Company to be compensated for its efforts by "retaining a portion of the shares that were kept and subsequently making some money on the sale of the shares by capital gain." Respondent also refers to testimony by Cook that "Pansing was going to keep 150,000 shares and Ellis had 100,000 and I wasn't going to pay a commission *390 in addition to letting them have that stock." Respondent says further that all persons concerned expected the market price to rise upon announcement of the acquisition and that the gain to be realized upon the subsequent sale was the intended compensation 30 for the company's services and, as compensation, is taxable as ordinary income. Respondent cites several cases [1] to the effect that the capital gains provisions are to be strictly construed and rejecting attempts by taxpayers to treat profits from ordinary business operations as capital gain instead of rent or interest or compensation. The Hort case involved the receipt of a payment for cancellation of a lease. The payment was in lieu of rents, which were to be paid to the taxpayer in the future under the lease and was held to be ordinary income. The receipt *391 of a lump sum as a substitute for rent is clearly distinguishable from the present case where no commission was agreed upon or legally payable to the corporate petitioner and where it bought and owned a capital asset which it eventually sold. Corn Products Co., supra, involved hedging transactions in corn futures carried on by the taxpayer as an integral part of its business operations. The gains or losses were frequent and were held to arise not from speculative investments but from the every day operation of its manufacturing of corn products. In the present case the corporate petitioner engaged in a speculative investment. Gillette Motor Co., supra, involved compensation for the temporary taking of the taxpayer's transportation business during World War II. The compensation, which was based upon the rental value of the taxpayer's facilities, was held to be received as ordinary income in the nature of rent, rather than payment for the conversion of capital assets, the assets having been returned. The Gillette case is not applicable in the present situation. The Midland-Ross Corp. case, supra, involved sale of non-interest bearing promissory notes *392 issued at a discount, in which the discount was held to be the equivalent of interest. The foregoing cases hold that the capital gains provisions are to be strictly construed. Petitioners concede the general proposition but contend that it is not applicable here. Respondent cites and relies upon William H. Husted, 47 T.C. 664 (1967), appeal dismissed (C.A. 2, 1969), Acq., C.B. 1968-2, 2. In that case the taxpayer, a promoter, "was permitted" to receive shares of stock at a bargain price as compensation for his promotional services. He was to pay $1 per share for some stock and $3 for other shares, while other parties paid $3 per share. This Court held that the difference between the price he paid and the value of the stock when acquired represented compensation, and that the additional price he later received upon the sale was capital gain. The value when acquired was found to be $7 per share. The taxpayer sold the stock later for more than $7 per share. The Court cited Commissioner v. LoBue, 351 U.S. 243 (1956), as holding that a bargain sale of stock to an employee because he is an employee is a compensatory sale. Respondent says that in the present *393 case the corporate petitioner "was permitted" to receive the 100,000 shares. That is not the fact. The company retained shares already owned. As Cook explained to his board of trustees "we didn't let them [Ellis and Pansing] have it because they had it all in effect and it was a question of them selling us what they would and not our letting them have anything." Nor did petitioners aquire these shares at a bargain price. Petitioners and Pansing sold shares to Bankers Life for about $1.70 per share. For the retained shares petitioners paid 13 cents for the option and $2 for the stock, or $2.13 per share for most of these shares. The Husted case supports petitioners in holding that the gain realized upon the appreciation in value between the times of acquisition and sale was capital gain. Respondent also relies upon Nielsen v. United States, 333 F. 2d 615 (C.A. 6, 1964). In Nielsen, a broker, pursuant to a customer's order, purchased 75,721 shares of a stock of which 55,000 shares were delivered and paid for. Later, the broker repurchased the 55,000 shares, gave the customer an option to buy the entire 75,721 shares, and held the shares as an investment. More than 6 *394 months later the customer exercised the option, taking the entire quantity. The dealer realized a gain on this sale. The Court of Appeals held that the sale of the 55,000 shares was pursuant to the customer's original binding order and was in the ordinary course of the broker's business with the proceeds taxable 31 as ordinary income, and that upon the sale of the additional 20,721 shares the transaction gave rise to capital gains, as there was no prior agreement for the ultimate purchase. In the holding that the sale of the surplus shares resulted in capital gains the Nielsen case supports the petitioners' position here. Respondent insists that Bankers Life was ready and willing in June 1960 to take the 100,000 shares retained by the petitioners and agreed at that time to purchase them later at a higher price in order to provide petitioners with a capital gain in lieu of a commission for the services of the corporate petitioner in assembling the stock for Bankers Life. The evidence is to the contrary. Cook testified that when Bankers Life bought 1,100,000 shares it had no intention of buying more, that there was then no agreement with petitioners to buy their retained shares *395 at a later date and no agreement as to the price to be paid in the event of a subsequent purchase, other than the market price at that later time. The price actually paid upon the purchases in 1961 and 1963 was determined by the market and was separately negotiated in 1961 and in 1963. Respondent refers to a memorandum by an officer of Bankers Life showing an agreement in January 1961 to buy some of the petitioners' shares at $4 before August 1, 1961. This verifies petitioners' contention of a separate negotiation. This agreement may have been made to protect Bankers Life against a rise in the market price for at that time small quantities were being traded at more than $4 and later in 1961 sales were made at prices increasing to $6. In early 1962 when shares of Nebraska National were trading at $5 to $6, Ellis wrote Pansing offering shares at that price and Pansing refused to buy. Cook also refused and Ellis sought to get clearance from the SEC to sell the remaining retained shares to outside buyers. This clearance, in the form of a "no action" letter, was refused. While the request was pending the trading price declined to $4 or less. In 1963 Ellis again offered the shares to Bankers *396 Life. Cook testified that Bankers Life had serious accounting problems in valuation of the Nebraska National stock as an asset, whether it should be carried on the books at cost or at market value and that he almost refused to buy the petitioners' shares in 1963. He finally consented to accept them. Bankers paid $4 per share, which was slightly under the trading price then. The evidence does not support respondent's contention that the sales to Bankers Life in 1961 and 1963 were prearranged in June 1960. Respondent argues that Bankers Life wanted petitioners' 100,000 shares and options in order to achieve two-thirds control of Nebraska National. This control was regarded as desirable in case Bankers Life later should desire to force a merger or liquidation of the subsidiary. Bankers Life was acquiring 55 percent of the authorized shares of Nebraska National. Petitioners' shares amounted to 5 percent. Acquisition of this quantity would not accomplish the two-thirds control desired. We note that Bankers Life was not willing to purchase options as its legal department had advised against that. If Bankers Life had bought the 50,000 shares retained by the corporate petitioner at its *397 cost of $90,000, plus the 50,000 options retained by the stockholders at 13 cents each, or $6,500, plus $100,000 to exercise the options, in addition to the price actually paid ($1,867,639.71), the total would exceed the two million dollars price authorized by the board of trustees. While Bankers Life had no intention of purchasing the petitioners' retained shares, Cook testified it wanted the right to buy them. This right was secured by the letter agreements which protected Bankers Life from having the stock sold to adverse interests. The arrangement was Pansing's creation. The individual petitioners embarked upon a venture with him to buy and sell an option. After he made the agreement with Cook the venture was directed to completing the deal. Pansing did the work of locating and negotiating to buy the shares and options. The individual petitioners contributed the services and facilities of their corporation to the joint venture. The corporate petitioner made no charge to its stockholders or their joint venture for its services of receiving and accounting for the shares and options secured by Pansing. The petitioners were able to borrow funds to make the purchases since the sale *398 to Bankers Life was assured and Bankers Life guaranteed $500,000 of the loans. The large loan of $1,300,000 was in effect for only a few minutes and a bank officer was present to hand over the check and receive the repayment. The services performed by the corporate petitioner were for its stockholders who had no intention of paying compensation. 32 It is a long established principle that, so long as there is substance to the transactions, taxpayers may so arrange their affairs that their taxes may be as low as possible and that the tax consequences flow from what they have done rather than what they might have done. United States v. Isham, 17 Wall. 496, 506 (1873); Seminole Flavor Co., 4 T.C. 1215, 1235 (1945); Koppers Co., 2 T.C. 152, 158 (1943). What was done here was perfectly legitimate, and was neither fictitious nor fraudulent. Pansing and the petitioners had rounded up more shares and options than Bankers Life required for control of Nebraska National. Pansing, who had arranged that he was to be continued as president of Nebraska National, *399 decided to retain shares or options for shares aggregating 150,000 for himself. The petitioners saw an opportunity for a favorable speculative investment. They retained options for 50,000 shares and 40,000 of the surplus shares in addition to the 10,000 shares held by the corporate petitioner since 1958. There were more than 20,000 shares left over which were sold to members of the board of Nebraska National or other buyers. The fact that a transaction is arranged to favor some of the parties taxwise affords the respondent no license to recast it into one of less advantage. Gyro Engineering Corp. v. United States, 417 F. 2d 437 (C.A. 9, Oct. 9, 1969). Koppers Co., supra.
A broker may carry securities in an investment account as separate from securities held for sale to customers and may treat the gains or losses from sales of such investment securities as capital gains or losses. Section 1236, Internal Revenue Code of 1954. The corporate petitioner *400 carried 50,000 shares of Nebraska National stock in its investment account. In the reply brief respondent for the first time contends that the identification requirements of section 1236(a) have not been met, since the ledger sheets showing the entries in the corporate petitioner's investment securities account do not show serial or stock certificate numbers for the shares. The statute requires that the item be "clearly identified in the dealer's records as a security held for investment." The regulations provide that a security is clearly identified as held for investment where appropriate entries are made in the dealer's books to distinguish the security from inventories and designate it as an investment, and by indicating with such entries, to the extent feasible, the individual serial number of the security or by adopting any other method of identification satisfactory to the Commissioner. The ledger records in evidence show the transfers to investment accounts of the appropriate numbers of shares. The accounts provide no space for identifying serial numbers. We do not doubt that the *401 corporate petitioner's supplementary records, had the question been timely raised, would provide this information. It is clear, however, from the stipulated facts, that the securities in question were identifiable by reason of the endorsements typed on the certificates noting that the particular shares were subject to the terms of two letters dated June 17, 1960. This identification, together with the ledger entries, is sufficient for the purpose of section 1236. We hold that the gain upon the sales of Nebraska National stock by the petitioners in 1961 and 1963 are taxable as capital gains. The second issue is whether the gains upon the sales made by the individual petitioners are taxable to the corporate petitioner. At the time of the closing of the deal with Bankers Life, the corporate petitioner transferred options for 50,000 shares to the individual petitioners at the cost price of 13 cents per share, which amounts they paid to the company. The individual petitioners exercised the options in December 1960, paying $2 additional for each share of stock. Later they sold the shares for capital gains. Respondent contends that the gains were income earned by the corporate petitioner *402 and are taxable to it. Respondent regards the transfers of options to the stockholders as "anticipatory arrangements" to attribute the fruits to a different tree from that on which they grew. The "fruits," according to the respondent, were the gains which were to be realized upon the subsequent sale of the stock which was to be acquired upon exercise of the options. We disagree. The transfers of the options to the stockholders were transfers of the trees, not the fruit. The stockholders paid the company for the options and paid Nebraska National the option price for the stock. Some of them borrowed funds to make the purchases and they took the risks of the market. Since we have held as to the first issue that the gains upon the sales of these shares were capital gains, it follows that what was here transferred was not income 33 already earned by the corporation. Whether income (fruit) would be derived was yet to be learned and depended upon the vagaries of the market which often brings disappointment to optomistic investors. Even if a principal purpose of the transfer was to avoid having any ultimate gains taxed to the corporation, that was a legitimate purpose under the circumstances *403 herein. The petitioners had another valid reason. The company was subject to regulation as a member of the Midwest Stock Exchange and should not have so large a part of its assets invested in a single stock. In August 1960 it had total assets of $473,994 including cash of $170,714 and investments of $117,903, of which $90,000 represented Nebraska National stock. If it had invested another $100,000 of its cash in additional shares it would have 40 percent of its assets in one investment. We conclude that the transfers to the stockholders were valid, that the gains to the stockholders on the sales of their shares were taxable as capital gains to them and that such gains were not income of the corporation nor dividends to the stockholders. The petitioners' part in the entire transaction was legitimate. Even if the arrangement was intended to minimize the tax effects, all the transactions were legal and were not fictitious nor so lacking in substance as to be different from their purport. They should be given effect. Granite Trust Company v. United States, 238 F. 2d 670 (C.A. 1, 1956). Decisions will be entered under Rule 50 in Docket Nos. 2980-67 and 2982-67. *404 Decisions will be entered for the petitioners in Docket Nos. 2979-67, 2981-67, and 201-68. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Mary L. Chapin, Docket No. 2980-67; J. Huntington Ellis and Madge M. Ellis, Docket No. 2981-67; George W. Holyoke and Dorothy W. Holyoke, Docket No. 2982-67; Ellis, Holyoke & Company, Docket No. 201-68.↩
1. Hort v. Commissioner, 313 U.S. 28 (1941). Corn Products Co. v. Commissioner 350 U.S. 46 (1955). Commissioner v. Gillette Motor Co., 364 U.S. 130 (1960). United States v. Midland-Ross Corp., 381 U.S. 54↩ (1965).